Filed 1/29/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE ex rel. JACKIE LACEY  as District Attorney, etc., | B290697 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC608075) |
| v. | |
| ALBERT ROBLES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.

Albert Robles, in pro. per., for Defendant and Appellant.

Jackie Lacey, District Attorney, Phyllis Asayama and Kenneth Von Helmolt, Deputy District Attorneys, for Plaintiff and Respondent.

Albert Robles (Robles) served simultaneously as a member of the board of directors of the Water Replenishment District of Southern California (WRD) and as mayor of Carson, California. The Los Angeles County District Attorney (District Attorney) obtained permission from the Attorney General to sue Robles in quo warranto, a Latin term for a legal proceeding that demands a person show by what authority he or she exercises a public office. In the quo warranto suit, the District Attorney argued Robles was violating Government Code section 1099 (Section 1099), which makes it unlawful to simultaneously hold incompatible public offices—meaning, as relevant here, offices for which "there is a possibility of a significant clash of duties or loyalties" based on the powers and jurisdiction of the offices. (§ 1099, subd. (a)(2).) The trial court agreed, removing Robles as a director of the WRD. We now consider, in the main, whether the District Attorney properly initiated the quo warranto action and whether Robles's two public offices are indeed incompatible within the meaning of the statute.

## I. BACKGROUND

### A. *Robles's Dual Offices*

The WRD serves 43 cities in southern Los Angeles County, including Carson.[1] The WRD is governed by a five-member board

---

[1] "Prior to the formation of the [WRD], groundwater was being produced from the Central Groundwater Basin . . . and the West Coast Groundwater Basin (collectively Basins) that provided water to residents in Los Angeles County in amounts that 'greatly exceeded natural replenishment, creating a condition in the Basins known as "overdraft." That overdraft condition caused numerous problems, including drastic overall decline of the elevation of the groundwater table and the

2

of directors, each of whom is assigned to represent one of five geographic divisions. Prior to his removal from office, Robles represented WRD division five, a division that includes Carson within its boundaries. He was first elected to the WRD in 1992, and he was re-elected continuously through November 2016 (his most recent term was to expire in 2020).

The Water Replenishment District Act empowers the WRD to replenish groundwater supplies by buying, selling, and exchanging water; spreading, sinking, and injecting water into aquifers; storing, transporting, recapturing, recycling, purifying, and treating water; and building infrastructure. (Water Code, § 60221.) The WRD is also authorized to make expenditures and take legal action to prevent contamination of, and remove contaminants from, water basins. (Water Code, § 60224.)

The WRD board of directors charges a "replenishment assessment" to fund its operating expenses and other activities. (Water Code, § 60305.) The replenishment assessment is "levied upon the production of groundwater from groundwater supplies within the district during the ensuing fiscal year" and "fixed by the board at a uniform rate per acre-foot of groundwater produced." (Water Code, § 60317.) Carson contracts with two private companies to provide pumped groundwater to the city and its residents, and the companies pay the WRD's

_____

intrusion of seawater into the Basins.' As a result of these concerns, in 1959 the [WRD] was formed by a vote of the citizens of Los Angeles County and pursuant to the Water Replenishment District Act enacted in 1955, codified at [Water Code] section 60000 et seq. . . ." (*Water Replenishment Dist. of Southern California v. City of Cerritos* (2013) 220 Cal.App.4th 1450, 1454 (*Cerritos*).)

replenishment assessment and pass on the cost in the water rates they charge.

Having opted to levy a replenishment assessment, the WRD board of directors is statutorily obligated to hold hearings each year to "determin[e] whether and to what extent the estimated costs thereof for the ensuing year shall be paid for by [the] replenishment assessment." (Water Code, § 60306.) Members of the public can attend these hearings, and as Robles testified during a deposition, residents in the area served by the WRD do attend the assessment-setting hearings every year. City council members (from cities other than Carson, Robles said) also attend to object to the amount of proposed replenishment assessments.

Beyond expressing views at a replenishment assessment hearing, a party opposing a replenishment assessment may file a "judicial action or proceeding to attack, review, set aside, void, or annul a resolution or motion . . . levying a replenishment assessment." (Water Code, § 60317.) In addition, as mayor of Carson, Robles can file—and has in the past filed—a protest with the Public Utilities Commission to object to the rates being charged by the two private water companies contracting with Carson.

While serving as a WRD director, Robles opted to run for a city council seat in Carson, and he was elected to the council in March 2013.[2] Late the following year, the District Attorney

---

[2] Robles's involvement in Carson politics, however, began earlier. In 2012, for instance, he lobbied the Carson city council not to join a lawsuit in which several neighboring cities challenged the WRD's 2010-2011 replenishment assessment as an illegal tax under Article XIII D of the California Constitution

4

informed Robles he was holding two incompatible offices under Section 1099, which meant under the law he would forfeit his WRD directorship. Robles nonetheless continued to occupy both offices, and in April 2015, Robles's Carson city council colleagues appointed him to fill the vacant office of mayor (as mayor he still sits on the city council).

### B. Quo Warranto Proceeding

In April 2015, the District Attorney applied to then-Attorney General Kamala Harris for leave to sue Robles in quo warranto. General Harris granted the application in a December 2015 published opinion, finding that "[w]hether the doctrine of incompatible offices precludes [Robles] from simultaneously serving as a director of the [WRD] and as city council member and mayor for the City of Carson presents substantial questions of fact and law warranting judicial resolution." (98 Ops.Cal.Atty.Gen. 94 (2015).)

Having obtained the Attorney General's leave to sue, the District Attorney filed a complaint in quo warranto in January 2016. The complaint alleged Robles had "usurped, intruded into, and unlawfully held and exercised the office of Director of the WRD in violation of [Section 1099], and continued to do so once he was sworn into the office of Mayor of the City of Carson . . . ." The complaint further alleged the two offices were incompatible under Section 1099 "because the WRD and the City of Carson have overlapping territory, duties and responsibilities, and a clash of duties is likely to arise in the exercise of both offices

---

(Proposition 218). (*Cerritos*, *supra*, 220 Cal.App.4th at pp. 1454-1461.)

5

simultaneously." The District Attorney sought Robles's ouster from the WRD board of directors under Section 1099 plus a fine and costs under Code of Civil Procedure section 809.

At the November 2016 general election, when the mayoral term the city council appointed him to fill was set to expire, Robles was elected mayor of Carson. Later in 2017, with the quo warranto proceeding well underway, the two public bodies on which Robles sat (the WRD board of directors and the Carson city council) took actions purporting to authorize him to simultaneously hold both offices. Specifically, in December 2017, the WRD board of directors adopted Resolution No. 17-1069, amending the WRD's administrative code to state WRD board members may "hold positions in other governmental agencies and cities within the District boundaries provided that the governmental agency or city is not a groundwater pumper/or has previously owned in the previous 25-years [*sic*] the right to pump groundwater within the District."[3] A few days later, the Carson city council passed an ordinance providing, with retroactive effect, that elected or appointed officers of the city may simultaneously hold certain other elected or appointed offices, including on the WRD's board of directors.[4]

---

[3] At oral argument, Robles represented that the WRD also enacted an ordinance to similar effect. As the trial court correctly observed, however, the record includes only an unsigned copy of the ordinance labeled "draft," which "is not evidence of any WRD action."

[4] The ordinance required a four-fifths majority to pass, and Robles cast the deciding fourth vote approving the ordinance.

The trial court held hearings on the quo warranto complaint in February and April 2018. At the first hearing, the trial court determined Robles's offices were incompatible under Section 1099 because there were several possible ways in which the duties and loyalties of both would conflict. These include Carson's potential interest in challenging replenishment assessments, Carson's power to make land use decisions impacting the groundwater supply, the possibility that Carson would acquire groundwater pumping rights and become even more directly enmeshed with the WRD, and the prospect that the WRD would negotiate to purchase public land in Carson to construct water-related infrastructure.

After receiving supplemental briefing and holding a second hearing, the trial court rejected Robles's contention that he was "compelled or expressly authorized by law" to hold both offices. The court found the WRD's enabling act does not permit it to authorize holding of other public offices and, even if it did, a mere resolution (which is what the WRD board of directors passed) does not have the force of law. The trial court also rejected Robles's contention that the quo warranto proceeding must be dismissed for lack of jurisdiction on the theory that the Attorney General's authorization to sue was no longer effective now that he had been re-elected to both offices in November 2016 and the terms he was serving at the time of the authorization had expired.

Having determined Robles was in violation of Section 1099, the trial court granted the District Attorney's quo warranto petition and, in May 2018, entered judgment removing Robles from the office of WRD director. This appeal ensued.

## II. DISCUSSION

We think it obvious that a shopkeeper who sets the prices that customers must pay would face a real possibility of divided loyalties if simultaneously selected to be a consumer advocate for the customers who patronize the store.[5]  On our facts, Robles is the shopkeeper—setting water replenishment assessments his Carson constituents must ultimately pay (or legally protest).  Section 1099 forbids this sort of conflicted arrangement by making it unlawful to hold multiple public offices where there is a "possibility of a significant clash of duties or loyalties" between them.  (§ 1099, subd. (a)(2).)

All the ancillary arguments Robles advances to avoid quo warranto removal as WRD director notwithstanding this conflict in loyalties are unpersuasive.  He contends, as we shall first

---

[5]  The memoirs of former President Ulysses Grant give us a more colorful illustration of the example:  "On one occasion, when stationed at a post of several companies commanded by a field officer, [Braxton Bragg] was himself commanding one of the companies and at the same time acting as post quartermaster and commissary. . . . As commander of the company he made a requisition upon the quartermaster—himself—for something he wanted.  As quartermaster he declined to fill the requisition, and endorsed on the back of it his reasons for so doing.  As company commander he responded to this, urging that his requisition called for nothing but what he was entitled to, and that it was the duty of the quartermaster to fill it.  As quartermaster he still persisted that he was right.  In this condition of affairs Bragg referred the whole matter to the commanding officer of the post.  The latter, when he saw the nature of the matter referred, exclaimed:  'My God, Mr. Bragg, you have quarreled with every officer in the army, and now you are quarrelling with yourself!'"  (Grant, Personal Memoirs of U.S. Grant (1886) vol. II, pp. 86-87.)

8

discuss, the quo warranto suit should never have been brought because the District Attorney is not a "private party" eligible to sue under Code of Civil Procedure section 803 (Section 803), the quo warranto statute.  But Section 803's use of the term "private party" does not preclude public officers like the District Attorney from suing in quo warranto where the Attorney General has given her permission—as former Attorney General Harris did here; the reference to "private" only serves to distinguish other parties from the Attorney General, who may herself prosecute a quo warranto action.  Robles also claims the two public bodies on which he sits consented to his holding of both offices so as to invoke a proviso in Section 1099 that allows simultaneous holding of even possibly conflicting offices when "compelled or expressly authorized by law."  (§ 1099, subd. (a).)  But that statutory reference to "law" should be read as a reference to state law, of which there is none exempting Robles, and regardless, the WRD passed only a resolution approving Robles's dual offices— and a resolution is not "law."  Finally, the remaining handful of arguments Robles raises seeking reversal of the trial court's quo warranto ruling are easily dispatched, as we shall explain.

> ### A.     *The District Attorney Is a Proper Party to Sue Under Section 803*

"The quo warranto remedy is currently codified in section 803, and it is 'the specific action by which one challenges "any person who usurps, intrudes into, or unlawfully holds or exercises any public office."'" (*Rando v. Harris* (2014) 228 Cal.App.4th 868, 875.)  The text of Section 803, last amended in 1907, provides in relevant part:  "An action may be brought by the attorney-general, in the name of the people of this state, upon his own

9

information, or upon a complaint of a private party, against any person who usurps, intrudes into, or unlawfully holds or exercises any public office, civil or military, or any franchise, or against any corporation, either de jure or de facto, which usurps, intrudes into, or unlawfully holds or exercises any franchise, within this state."

"The prominent role of the Attorney General has its origins deep in British history for reasons largely irrelevant today. [Citation.]  The modern rationale is, 'The remedy of *quo warranto* is vested in the People, and not in any private individual or group, because disputes over title to public office are viewed as a public question of governmental legitimacy and not merely a private quarrel among rival claimants . . . . [¶] . . . [¶]  Although the Attorney General occasionally brings a *quo warranto* action on the initiative of that office, or at the direction of the Governor, usually the action is filed and prosecuted by a private party who has obtained the consent of the Attorney General, for "leave to sue in *quo warranto*." . . .'  [Citations.]"  (*Nicolopulos v. City of Lawndale* (2001) 91 Cal.App.4th 1221, 1228.)  The Attorney General's gatekeeping function "also 'protects public officers from frivolous lawsuits.' [Citation.]"  (*Id*. at p. 1229.)

The procedures by which a putative party other than the Attorney General seeks leave to sue in quo warranto are set forth in California Code of Regulations, title 11, sections 1 to 11, which emphasize the Attorney General's ongoing supervisory role after granting a relator (i.e., a party suing on the People's behalf) leave to sue.  (Cal. Code Regs., tit. 11, § 8 ["The Attorney General may at all times, at any and every stage of the said proceeding, withdraw, discontinue or dismiss the same, as to him may seem fit and proper; or may, at his option, assume the management of

10

said proceeding at any stage thereof"]; see also *People ex rel. City of Downey v. Downey County Water Dist.* (1962) 202 Cal.App.2d 786, 803 (*Downey*).)

Here, there is no dispute the District Attorney sought and obtained leave to sue Robles in quo warranto by following the procedures established by the pertinent regulations.  Robles contends, however, that the Attorney General had no power to authorize the District Attorney to sue because she is not a "private party" eligible to serve as a relator under Section 803.[6] Robles's chief argument in support of this narrow understanding of the language of Section 803 is that another code section exclusively defines the circumstances under which a local government entity may prosecute a quo warranto action.

The code section Robles cites, Code of Civil Procedure section 811, provides that a quo warranto action "may be maintained by the board of supervisors of any county or city and county or the legislative body of any municipal corporation, respectively, in the name of such county, city and county or municipal corporation against any person who usurps, intrudes into or unlawfully holds or exercises any franchise, or portion thereof, within the respective territorial limits of such county, city and county or municipal corporation and which is of a kind

---

[6]     Robles did not make this argument during the proceedings below; there was no challenge that the District Attorney was statutorily ineligible to prosecute the quo warranto action.  The issue is therefore forfeited on appeal, but we exercise our discretion to address the point because it involves a pure question of law on a subject of significant public interest.  (*Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 6-7 & fn. 2; *City of San Diego v. Boggess* (2013) 216 Cal.App.4th 1494, 1503.)

11

that is within the jurisdiction of such board or body to grant or withhold." According to Robles, it was improper for the District Attorney to proceed under Section 803 when the County Board of Supervisors could have proceeded under Code of Civil Procedure section 811. But unlike Section 803, which provides for quo warranto actions involving both offices and franchises, Code of Civil Procedure section 811 addresses only the latter. The County Board of Supervisors therefore could not have sued to oust Robles from his WRD office under this section.

Furthermore, Code of Civil Procedure section 811 does not limit public officers' eligibility to serve as relators under Section 803. Rather, it defines circumstances under which a local government entity may file a quo warranto complaint in its own name, i.e., without obtaining the Attorney General's consent to bring an action in the name of the People of the State of California. (See *City of Oakland v. Hogan* (1940) 41 Cal.App.2d 333, 344-345 ["Section 811 of the Code of Civil Procedure gives the right to a board of supervisors or the legislative body of a municipal corporation, in the name of the county or in the name of the municipality, to bring an action in *quo warranto*"]; *San Ysidro Irrigation Dist. v. Superior Court of San Diego County* (1961) 56 Cal.2d 708, 716 (*San Ysidro*) ["'The provisions of Section 811 apparently are desirable for two reasons: (1) They permit such actions to be maintained by local bodies, which usually have a very direct and immediate interest in preventing the usurpation of such franchise; (2) The Attorney General may be relieved of the necessity of maintaining such an action if the local body proceeds to do so'"].)

In rejecting Robles's understanding of Section 803, we are convinced the statute's reference to a "private party" serves only

12

to distinguish the Attorney General from others, public or private, that she may authorize to sue. Present and past Attorneys General have "never interpreted the language of section 803 in such a narrow manner as to exclude public officers and agencies from qualifying as relators" (76 Ops.Cal.Atty.Gen. 157, 163 (1993)), and even more important, there is a bevy of published case law in which public entities have brought quo warranto actions on behalf of the People of the State of California. (See, e.g., *People ex rel. City of Commerce v. Argumedo* (2018) 28 Cal.App.5th 274, 278-279 [city "sought permission from the California Attorney General to sue [city council member] in quo warranto, pursuant to [Section 803]"]; *People ex rel. City of Bellflower v. Bellflower County Water Dist.* (1966) 247 Cal.App.2d 344, 345 [city brought quo warranto action to challenge existence of water district]; see also *San Ysidro, supra*, 56 Cal.2d at p. 714 [citing Attorney General's opinion in another case that "a municipal corporation has no status different from a 'private person' in testing the validity of the existence of another political subdivision and so is subject to [Section 803]"].) We therefore hold the former Attorney General properly deputized the District Attorney under Section 803 to bring this quo warranto action.

   B.    *Robles's Dual Offices Are Incompatible Because They Give Rise to a Possibility of a Conflict In Duties or Loyalties and There Is No "Law" Compelling or Expressly Authorizing Him to Hold Both Offices*

   In a quo warranto action, the person holding multiple offices—not the party suing in quo warranto—has the burden to prove the offices are compatible. (*People ex rel. Stephenson v.*

13

*Hayden* (1935) 9 Cal.App.2d 312, 313; *People ex rel. Smith v. City of San Jose* (1950) 100 Cal.App.2d 57, 59 [""It was a peculiarity of both the common-law writ of quo warranto and information in the nature of quo warranto that the ordinary rules of pleading were reversed and the state was bound to show nothing""""].) Robles does not dispute the trial court's factual determinations concerning the functions of his two offices, but he contends the trial court applied incorrect legal standards in concluding they are incompatible.

### 1.    *A possible clash of duties or loyalties*

Section 1099 prohibits public officers from simultaneously holding two incompatible public offices. (§ 1099, subd. (a).) With one exception, offices are incompatible if "(1) Either of the offices may audit, overrule, remove members of, dismiss employees of, or exercise supervisory powers over the other office or body. [¶] (2) Based on the powers and jurisdiction of the offices, there is a possibility of a significant clash of duties or loyalties between the offices. [¶] (3) Public policy considerations make it improper for one person to hold both offices." (§ 1099, subd. (a).) The exception applies when "simultaneous holding of the particular offices is compelled or expressly authorized by law"; in that circumstance, the offices are not deemed incompatible even if one (or more) of the three aforementioned circumstances is true. (§ 1099, subd. (a).) A public officer holding incompatible offices "shall be deemed to have forfeited the first office upon acceding to the second."[7] (§ 1099, subd. (b).)

---

[7]    Enactment of Section 1099 was meant to codify the common law rule prohibiting an individual from holding incompatible public offices. (§ 1099, subd. (f).) An uncodified

Section 1099's definition of incompatible offices is not materially different from the formulation recited in an Attorney General quo warranto opinion that is described as the "impetus" for codifying the common law rule against holding incompatible offices. (Assem. Jud. Com., Analysis of Sen. Bill No. 274 (2005-2006 Reg. Sess.) July 5, 2005, p. 3.) That opinion authorized a quo warranto suit against Blanca Rubio, who was serving as a director of a water district and as a trustee of a school district within the same water district. (87 Ops.Cal.Atty.Gen. 153, 153 (2004) (the Rubio Opinion).) Citing prior Attorney General opinions that rely, among other things, on a 1940 case decided by our Supreme Court (*People ex rel. Chapman v. Rapsey* (1940) 16 Cal.2d 636 (*Rapsey*)), the Rubio Opinion states the following test for incompatibility, which was later incorporated in Section 1099: "'Offices are incompatible if one of the offices has supervisory, auditory or removal power over the other or if there would be any significant clash of duties or loyalties in the exercise of official duties. Only one potential significant clash of duties or loyalties is necessary to make offices incompatible.' [85 Ops.Cal.Atty.Gen. 60, 61 (2002).]" (87 Ops.Cal.Atty.Gen. 153, 154 (2004).)

The facts and holding of the *Rapsey* decision cited in the Rubio Opinion help illustrate the meaning of the key provision in

_____

section of Senate Bill No. 274, the legislation that added Section 1099 to the Government Code, emphasizes that "[n]othing in this act is intended to expand or contract the common law rule prohibiting an individual from holding incompatible public offices. It is intended that courts interpreting this act shall be guided by judicial and administrative precedent concerning incompatible public offices developed under the common law." (Stats. 2005, ch. 254, § 2.)

15

Section 1099 for purposes of this appeal, namely, the one deeming offices incompatible if they present the possibility of a significant clash of duties or loyalties.  The defendant in *Rapsey* held the positions of city judge and city attorney in San Bruno.  (*Rapsey*, *supra*, 16 Cal.2d at p. 637.)  The defendant maintained the two positions were compatible because the city attorney was not required to "appear before the city court in connection with prosecutions which might arise under any of the city ordinances."  (*Id.* at p. 643.)  Our Supreme Court rejected that view, concluding it was "obvious that [the defendant] *may be required* from time to time to appear before the city judge and prosecute or defend actions to which the city is a party."  (*Ibid.*, italics added.)  This prospect rendered the duties of the offices "'repugnant'" because in that circumstance the defendant could "'only perform the duties of one office by neglecting to perform the duties of the other.'"  (*Ibid.*)

In its analysis, the *Rapsey* court surveyed case law and commentary applying the common law of incompatible offices.  The authorities the *Rapsey* court reviewed varied to some degree in describing how severe a clash between duties or loyalties must be to render two offices incompatible.  (*Rapsey*, *supra*, 16 Cal.2d at pp. 641-642.)  But the holding in *Rapsey* and the authorities quoted are unanimous, however, that a clash of duties or loyalties need not actually be realized to render two offices incompatible.  Rather, incompatibility is determined by the functions of the two offices in the abstract and there need not be a showing that an officeholder's loyalties actually have been tested—or that it is inevitable they will be tested—for the offices to be incompatible.  (*Ibid.* ["'Incompatibility arises . . . from the nature of the duties of

16

the offices'"]; see also *id.* at p. 642 ["'where the functions of two offices are inconsistent, they are regarded as incompatible'"].)

This principle has been adopted and applied in myriad subsequent Attorney General opinions, including the Rubio Opinion. (87 Ops.Cal.Atty.Gen. 153, 154 (2004) ["Whether an actual conflict in duties has previously occurred in the two offices is not determinative since it is sufficient that a conflict may occur 'in the regular operation of the statutory plan'"]; see also 63 Ops.Cal.Atty.Gen. 623, 626 (1980) ["The fact that some of our opinions had analyzed the question of incompatibility from the viewpoint of *actual* conflict does not detract from the fact that potential as well as actual conflicts of duties and loyalties are encompassed by the doctrine"]; 67 Ops.Cal.Atty.Gen. 409, 414 (1984); 101 Ops.Cal.Atty.Gen. 56, 61-62 (2018).) More important, Section 1099 itself adopts this principle in its text, stating *a possibility* of a significant clash of duties or loyalties is what renders two offices incompatible.[8] (§ 1099, subd. (a)(2); Oxford

---

[8] The sound prophylactic rationale that supports the principle is summarized in a more recent 2010 Attorney General opinion: "The rule does not await the occurrence of an actual clash before taking effect, but intercedes to prevent it; the mere possibility of a conflict is sufficient to make two offices incompatible. . . . Regardless of the honor or integrity of the incumbent, one individual cannot hold two incompatible offices at the same time. It is the nature of the office, not the character of the individual, that determines the rule's application. The essence of the doctrine of incompatible offices is that a public officer should never be in the position of having to disqualify himself or herself from performing the functions of one office because he or she happens to be the incumbent of another office. 'He can only perform the duties of one office by neglecting to perform the duties of the other. It is not for him to say in a

17

English Dict. Online (2019)
<https://oed.com/view/Entry/148375?redirectedFrom=
possibility#eid> [as of Oct. 18, 2019] ["possibility" includes "[t]he
condition or quality of being possible; capability of existing,
happening, or being done (in general, or under particular
conditions). Also: contingency, likelihood, chance"], archived at
<https://perma.cc/W6K2-P9JC>.)

Notwithstanding the plain meaning of Section 1099, Robles
contends that offices are compatible unless there is a "concrete"
conflict capable of repetition. Robles claims support exists for his
reading of the statute in *Rapsey*'s observation that "it is obvious
that [the defendant, in his role as city attorney,] may be required
from time to time to appear before the city judge." (*Rapsey*,
*supra*, 16 Cal.2d at p. 643.) But that observation hurts, not
helps, Robles's case. Our Supreme Court's use of the word "may"
describes a possible state of affairs, i.e., circumstances that might
or might not come to pass. (Oxford English Dict. Online (2019)
<https://www.oed.com/view/Entry/115287?rskey=ulgcXC&result=
5&isAdvanced=false#eid> [as of Oct. 28, 2019] [various
definitions of "may," including: "7. Expressing present subjective
possibility, i.e. the admissibility of a supposition, in a direct or
indirect statement"], archived at <https://perma.cc/KR9R-
EGG4>.) That possibility, however, was enough for the *Rapsey*
court to conclude the two offices in question were incompatible.
We therefore approach the question in this case with the
appropriate common law and statutory framing in mind: not

particular instance which he will perform and which he will not.
The public has a right to know with certainty.'" (93
Ops.Cal.Atty.Gen. 110, 111 (2010).)

18

whether such a clash for a WRD director who is simultaneously a mayor and councilmember for a city within the WRD's boundaries is inevitable or more likely than not, but whether it is possible.

The trial court found several significant clashes of duties or loyalties would possibly arise from Robles's simultaneous holding of the WRD and Carson offices, but only one is necessary to create a problematic conflict under Section 1099. (§ 1099, subd. (a)(2) [offices are ordinarily incompatible if "there is a possibility of *a* significant clash of duties or loyalties"], italics added.) We focus on the WRD's replenishment assessment authority, and as already foreshadowed, we are convinced Robles has not carried his burden to show, considering the powers and jurisdiction of his dual offices, there is no possibility of a significant clash of duties or loyalties.

As a WRD director, Robles must set the replenishment assessment levies each year that will ultimately be paid by his constituents in Carson, among others (and the city itself, as government buildings and agencies are concerned). Just as in *Rapsey*, it is obvious this may give rise to conflicts: as mayor and a councilmember, Robles faces at least a short-term electoral incentive—if not an office-holding duty—to minimize the amount of the replenishment assessment those in Carson must pay. As a WRD director, on the other hand, Robles's duties and loyalties point largely in the opposite direction and require his chief concern in setting the amount of the replenishment assessment to be ensuring the adequacy of the groundwater supply, not the financial impact of the assessment on the cities and residents that must pay it.

19

Though not necessary to our conclusion, the historical record shows the conflict in the powers and jurisdiction of the offices we have described is not merely a theoretical one. In deposition, Robles confirmed local residents appear at the replenishment assessment setting hearings every year and even city council members from affected cities attend to object to proposed assessments. Though the record does not tell us in what cities live the residents who have appeared at these hearings nor what cities have been represented by the officials who have attended, it is quite possible that Carson residents have appeared or may appear in the future to object to proposed replenishment assessments, which would put Robles in the difficult (we would say unlawful) position of trying to balance countervailing incentives and duties. Furthermore, objections to replenishment assessments have in the past ripened into litigation between cities and the WRD. (See, e.g., *Cerritos*, *supra*, 220 Cal.App.4th 1450.) If past is indeed prologue (Shakespeare, The Tempest, act II, scene 1, line 289), it is certainly possible disputes between the WRD and its customers—cities and residents in the area the WRD covers—will again arise. And even if such a dispute does not first arise between Carson and the WRD, there is a distinct possibility that Carson will be asked to take sides, as evidenced by Robles's efforts in 2012 to lobby the Carson city council not to join the *Cerritos* litigation. Perhaps it goes without saying, but there is little better example of divided duties or loyalties than being a party on both sides of a lawsuit— or even, for that matter, being forced to pick a side.

Section 1099 is meant to ensure a conflict in duties or loyalties between public offices never materializes. We are confident here the trial court correctly concluded Robles did not

carry his burden to show there is no possible significant clash of duties with respect to Robles's WRD role in setting replenishment assessments and acting as an advocate for Carson residents and government agencies as water consumers.

### 2. Holding both offices is not compelled or expressly authorized by law

Notwithstanding the conflict in duties and loyalties we have identified, Section 1099 does not deem offices beset by such a conflict incompatible if "simultaneous holding of the particular offices is compelled or expressly authorized by law." (§ 1099, subd. (a).) Robles maintains this exception of sorts applies here because the WRD board of directors on which he sits passed a resolution (stated in general terms but obviously meant to apply to him) authorizing directors to hold positions in other governmental agencies and cities within the District boundaries and because the city council on which he sits approved an ordinance (with his deciding vote) retroactively authorizing city elected or appointed officials to simultaneously hold office as a director of the WRD or on certain other public bodies. We reject Robles's reliance on the "compelled or expressly authorized by law" proviso in Section 1099 for two reasons: first, the Legislature's reference to "law" is best understood as a reference to state, not local, law, and second, even if the reference to "law" could be understood to allow local jurisdictions to deem offices compatible notwithstanding a possible conflict in duties or loyalties, all of the affected office-holding local jurisdictions must enact such a law. Here, the WRD has no authority to authorize its board members to hold incompatible offices and a WRD resolution is not law for purposes of Section 1099.

21

Discussing the first of these reasons first, the most natural reading of the Legislature's unqualified use of the term "law" in Section 1099 is as a reference to law passed by the same body that enacted Section 1099, i.e., state law.[9]  Even more to the point, however, that understanding of the statute is confirmed by its drafting history.

The Legislature settled upon Section 1099's "compelled or expressly authorized by law" provision only after first proposing draft language that stated there would be exemptions to the prohibition on holding offices with conflicting duties or loyalties "as provided in [Government Code] Sections 1128 and 1129" and "as provided by local ordinance."  (Sen. Bill No. 274 (2005-2006 Reg. Sess.) as introduced Mar. 29, 2005.)  In its analysis of this earlier draft of the statutory language, the Senate Local Government Committee warned that "[l]ocal loopholes loom[ed]" because "[a]ny time the Attorney General finds conflicts, local officials could wiggle out of the problem by persuading their colleagues to adopt local ordinances."  (Sen. Local Gov. Com., Analysis of Sen. Bill No. 274 (2005-2006 Reg. Sess.) Apr. 6, 2005, p. 3.)  By removing the "as provided by local ordinance" clause, the Legislature eliminated the risk of such loopholes and reserved for itself the sole power to create exceptions to Section 1099.[10]

---

[9]     Insofar as public officers may be compelled or authorized to occupy certain offices under federal law, there would be no need to specify that "law" includes federal law.  The Legislature would know that under well-established supremacy principles, federal law would preempt state law to the contrary.

[10]     Robles contends Section 1099 preserved a common law rule that local bodies may authorize individuals to hold incompatible

22

This legislative intention is borne out by historical practice prior to Section 1099's enactment, at least with respect to dual office-holding of the type at issue here. In 1990 (years before the Legislature enacted Section 1099), the Legislature made a WRD-specific exemption to the common law incompatible offices doctrine by passing legislation that *did* allow WRD directors to simultaneously serve as elected city officials. The WRD, however, lobbied against the legislation—arguing it would give rise to unacceptable conflicts[11]—and the Legislature repealed it

offices. The cases he cites for such a rule, however, merely confirm the *Legislature's* ability to do so. (See *American Canyon Fire Protection Dist. v. County of Napa* (1983) 141 Cal.App.3d 100, 104 ["We conclude that the Legislature has chosen to abrogate the common law"]; *McClain v. County of Alameda* (1962) 209 Cal.App.2d 73, 79 ["There is nothing to prevent the Legislature, however, from allowing, and even demanding, that an officer act in a dual capacity"].) Although the Attorney General opined, prior to Section 1099's enactment, that "a charter city may abrogate the common law rule [against holding incompatible offices] by appropriate legislation" (82 Ops.Cal.Atty.Gen. 201, 204), any such power does not itself derive from the common law. (*Ibid.*; 66 Ops.Cal.Atty.Gen. 293, 296-298.) Thus, the Legislature's expressed intention not to "expand or contract" the common law (Stats. 2005, ch. 254, § 2) does not demonstrate it intended to permit locally authorized exceptions to Section 1099. Indeed, the available legislative history we have already discussed confirms the opposite, i.e., that the Legislature intended to occupy the field on a matter of statewide concern and preclude "local loopholes." (See *T-Mobile West LLC v. City and County of San Francisco* (2019) 6 Cal.5th 1107, 1116 [discussing preemption principles generally].)

[11] In a letter to the Governor urging repeal of the exception, the then-president of the WRD argued: "Elected public officials

the following year.  (Assem. Com. on Local Gov., Analysis of Assem. Bill No. 2231 (1991-1992 Reg. Sess.) Mar. 14, 1991, p. 2; Stats. 1991, ch. 1176, § 3.)  This history provides further evidence that when the Legislature enacted a statute that allowed holding possibly conflicting public offices if "compelled or expressly authorized by law," it had in mind state laws of the type it had earlier enacted and repealed.  We are therefore of the view that the Carson ordinance and WRD resolution enacted here cannot make Robles's occupancy of two offices compatible by being "compelled or expressly authorized by law."

Moreover, even assuming for argument's sake that "compelled or expressly authorized by law" were meant to include local law, not just state (or federal) law, the trial court was correct that the WRD lacks authority to authorize a board member to hold incompatible offices.  The WRD resolution in question includes a boilerplate reference to the WRD's "legislative authority" in a preamble, but the resolution cites no provision of the WRD's enabling legislation giving it the power to permit board members to hold incompatible offices.  To the contrary, "[w]ith the exception of powers related to groundwater contaminants, WRD's power may be exercised only for replenishment purposes.  ([Water Code] §§ 60221, 60224, 60230.)" (*Central and West Basin Water Replenishment Dist. v. Southern*

_____

should not be permitted to make decisions for two entities with conflicting responsibilities.  Among other things, a Replenishment District has the power to levy groundwater pumping assessments on cities, has the power of eminent domain, and frequently enters into contracts with cities within its boundaries.  These are all areas where conflicts are likely, and where a single elected official should not serve both districts."

24

*Cal. Water Co.* (2003) 109 Cal.App.4th 891, 897.) Even the broadest grant of power to replenishment districts, Water Code section 60220's provision that a replenishment district "may do any act necessary to replenish the ground water of said district," is not plausibly read to support a resolution intended to exempt board members from Section 1099. Nothing in the record suggests Robles's presence—especially while simultaneously holding an incompatible office—is necessary to the WRD's functioning.

Robles's related contention that the Carson ordinance alone is sufficient to trigger the Section 1099 compelled or authorized exception cannot be reconciled with the rationale underlying the incompatible offices doctrine. Incompatibility is a two-way street. The Carson ordinance does not direct city council members who hold incompatible offices to put the duties of their other office first in all instances. In other words, the Carson ordinance does not *eliminate* the possibility of a significant clash of duties or loyalties—it *accepts* that possibility. Even if the residents of Carson can live with a conflicted mayor, they cannot decide for the residents of the 42 other cities within the WRD's boundaries that a conflicted WRD board member is acceptable.

C. *The District Attorney Was Not Required to Re-Apply for Leave to Maintain the Quo Warranto Suit*

Robles had just over 10 months left to serve in his elected WRD board term and his appointed Carson mayoral term when the Attorney General granted the District Attorney leave to sue in late 2015. In discussing general principles Attorneys General have applied in determining whether a quo warranto action would serve the public interest, the Attorney General opinion

authorizing this action explained that, generally, "the need for judicial resolution of a substantial question of fact or law [i]s a sufficient 'public purpose' to warrant granting leave to sue, absent countervailing circumstances not present here (such as pending litigation or shortness of time remaining in the term of office)." (98 Ops.Cal.Atty.Gen. 94, 101 (2015).)  The Attorney General concluded leave to sue should be granted notwithstanding the prospect that Robles's terms in office might expire before the quo warranto action concluded.

Though the District Attorney obtained the Attorney General's authorization to sue without temporal limitation and filed the quo warranto action before the term Robles was then serving expired, Robles contends the District Attorney was required to re-apply for leave to sue when he began serving new terms upon his election to both offices in November 2016.  In so contending, Robles relies on the reasoning in an 1895 Supreme Court case:  "Each term of an office is an entity separate and distinct from all other terms of the same office.  If [an officeholder] violate[s] any duty imposed upon him as an incumbent of the office . . . during a former term the law furnishes a mode or modes for his punishment; but to remove him from an office to which he has been subsequently elected is not the punishment for such violation of duty prescribed by any law of this state." (*Thurston v. Clark* (1895) 107 Cal. 285, 288 (*Thurston*).)

*Thurston*, however, has no relevance to quo warranto proceedings; the officeholder in *Thurston* faced removal under a former Penal Code statute repealed in 1929.  (*Thurston, supra*, 107 Cal. at p. 287.)  That statute permitted removal of an officeholder for misconduct in office, and construed strictly as a

26

penal statute, the *Thurston* court concluded this "in office" language must be understood to permit removal only while serving the term during which the misconduct occurred. (*People v. Cherry* (1989) 209 Cal.App.3d 1131, 1133.) Section 1099 is not a penal statute, however, and regardless, it admits of no similar "in office" limitation.

Moreover, even if the *Thurston* holding were found to have some bearing on civil quo warranto proceedings, it would not dictate a different result here. Robles was not removed from the WRD board of directors because of some discrete act of misconduct prior to November 2016. He was removed from his position because he continuously occupied incompatible offices both before and after November 2016. Robles held both offices when the Attorney General authorized the quo warranto proceeding, and he held both offices when the trial court rendered its decision removing him from the office of WRD director. That is all that was necessary.[12]

---

[12] Beyond being legally unnecessary, requiring a party bringing a quo warranto action to seek leave to maintain an already-filed lawsuit upon a dual officeholder's commencement of new terms of office is also practically unnecessary. Under settled law, "[t]he Attorney General may at all times, at any and every stage of [a quo warranto] proceeding, withdraw, discontinue or dismiss the same, as to him may seem fit and proper; or may, at his option, assume the management of said proceeding at any stage thereof." (Cal. Code Regs., tit. 11, § 8; see also *Downey*, *supra*, 202 Cal.App.2d at p. 803 ["A quo warranto proceeding brought in the name of the People is not to redress the wrongs of the relator nor to enforce its rights; it is in no legal sense under the relator's control"].) There is no need to seek authority from the Attorney General to maintain an already-filed quo warranto

*D.    The Order Precluding Robles from Deposing the*
*District Attorney Was Not an Abuse of Discretion*

During discovery, the District Attorney moved for a protective order prohibiting Robles from taking her deposition. Robles contended he was entitled to take the District Attorney's deposition because, based on his understanding of Section 803, she was necessarily suing him in her capacity as a private citizen. The trial court rejected this premise, found the District Attorney had no unique or superior knowledge concerning the quo warranto action, and issued the protective order.  The trial court also indicated, although no motion was then before it, that it was "likely" to grant a motion for a protective order prohibiting Robles from taking the deposition of the deputy district attorney handling the case.

Robles contends the District Attorney cannot simultaneously qualify as a "private party" for purposes of Section 803, the quo warranto statute, and as the head of a public agency for purposes of the discovery rules under which the trial court issued the protective order prohibiting Robles from taking her deposition.  (See generally *Nagle v. Superior Court* (1994) 28 Cal.App.4th 1465, 1467-1468 ["It is the general rule in California and federal courts that the heads of agencies and other top governmental executives are normally not subject to depositions"] (*Nagle*).)  As we have explained, however, the term "private party" in Section 803 is meant only to refer to individuals or entities other than the Attorney General.  Absent a showing that the District Attorney had direct personal factual information

lawsuit because the Attorney General at any time may assume control of the prosecution of the action or dismiss it.

28

pertaining to material issues in this case that is not available through any other source—a showing Robles did not make—he was not entitled to take the District Attorney's deposition. (*Nagle*, *supra*, at p. 1468; *Contractors' State License Bd. v. Superior Court* (2018) 23 Cal.App.5th 125, 132.)

In addition to arguing the trial court improperly issued a protective order as to the District Attorney, Robles contends the trial court improperly "refused to allow" him to depose trial counsel. The trial court did not, however, prohibit Robles from noticing a deposition of the deputy district attorney—it merely indicated it was "likely" to issue a protective order if the issue were presented. The issue never was presented, though, and Robles cannot obtain reversal by challenging an order the trial court never made.

### E. The Trial Court Did Not Rely on Evidence It Excluded

Robles contends the trial court's conclusions are based on evidence it previously excluded as inadmissible. He suggests a declaration submitted by a deputy district attorney was "gutt[ed]" by three sustained objections, observes the declaration is cited 88 times in the trial court's decision, and leaves it to us to infer that some number of these citations must be to inadmissible statements. The trial court's evidentiary rulings left most of the declaration untouched, however, and the court's conclusions are not based on statements ruled inadmissible.

29

## DISPOSITION

The judgment is affirmed.  Respondent is awarded costs on appeal.

**CERTIFIED FOR PUBLICATION**


BAKER, J.

We concur:


RUBIN, P. J.


KIM, J.